# ASSOCIATED PRESS ET AL. *v.* UNITED STATES.

NO. 57.

Argued December 5, 6, 1944.—Decided June 18, 1945.

*Mr. John T. Cahill,* with whom *Messrs. Thurlow M. Gordon, Morris Hadley, Timothy N. Pfeiffer, Robert T. Neill, George Nebolsine, Jerrold G. Van Cise* and *John W. Nields* were on the brief, for the Associated Press et al., appellants in No. 57 and appellees in No. 59.

*Mr. Howard Ellis,* with whom *Messrs. Weymouth Kirkland, A. L. Hodson* and *Louis G. Caldwell* were on the brief, for the Tribune Company et al., appellants in No. 58.

*Assistant Attorney General Berge* and *Mr. Charles B. Rugg,* with whom *Solicitor General Fahy, Messrs. Charles H. Weston* and *Paul A. Freund* were on the brief, for the United States.

Briefs were filed by *Mr. Matthias Concannon* on behalf of Chicago Times, Inc., and by *Mr. Elisha Hanson* on behalf of the American Newspaper Publishers Association, as *amici curiae,* urging reversal of the decree of the District Court and dismissal of the complaint.

*Messrs. Louis S. Weiss, Carl S. Stern* and *Samuel J. Silverman* filed a brief on behalf of Field Enterprises, Inc., as *amicus curiae,* in support of the United States.

MR. JUSTICE BLACK delivered the opinion of the Court.*

The publishers of more than 1,200 newspapers are members of the Associated Press (AP), a cooperative

---

*In Number 59, all the sitting Justices concur. In Numbers 57 and 58, MR. JUSTICE REED, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE concur. MR. JUSTICE FRANKFURTER concurs in that part of the opinion which discusses the District Court's decree but concurs in the judgment of affirmance in a separate opinion.

association incorporated under the Membership Corporation Law of the State of New York. Its business is the collection, assembly and distribution of news. The news it distributes is originally obtained by direct employees of the Association, employees of the member newspapers, and the employees of foreign independent news agencies with which AP has contractual relations, such as the Canadian Press. Distribution of the news is made through interstate channels of communication to the various newspaper members of the Association, who pay for it under an assessment plan which contemplates no profit to AP.

The United States filed a bill in a Federal District Court for an injunction against AP and other defendants charging that they had violated the Sherman Anti-Trust Act, 26 Stat. 209, in that their acts and conduct constituted (1) a combination and conspiracy in restraint of trade and commerce in news among the states, and (2) an attempt to monopolize a part of that trade.

The heart of the government's charge was that appellants had by concerted action set up a system of By-Laws which prohibited all AP members from selling news to non-members, and which granted each member powers to block its non-member competitors from membership. These By-Laws, to which all AP members had assented, were, in the context of the admitted facts, charged to be in violation of the Sherman Act. A further charge related to a contract between AP and Canadian Press (a news agency of Canada, similar to AP), under which the Canadian agency and AP obligated themselves to furnish news exclusively to each other. The District Court, composed of three judges, held that the By-Laws unlawfully restricted admission to AP membership, and violated the Sherman Act insofar as the By-Laws' provisions clothed a member with powers to impose or dispense with conditions upon the admission of his business competitor.

Continued observance of these By-Laws was enjoined. The court further held that the Canadian contract was an integral part of the restrictive membership conditions, and enjoined its observance pending abandonment of the membership restrictions. The government's motion for summary judgment, under Rule 56 of the Rules of Civil Procedure,[1] was granted and its prayer for relief was granted in part and denied in part. 52 F. Supp. 362. Both sides have brought the case to us on direct appeal. 15 U. S. C., § 29; 28 U. S. C., § 345.

At this point, it seems advisable to pass upon the contention of the appellants that there were genuine disputes as to material facts and that the case therefore should have gone to trial. The only assignments of error made by the appellants in No. 57 (*Associated Press et al. v. United States*) relating to this question are that the court erred "In holding that there was no genuine issue between the parties as to any material fact" and "In not entering summary judgment against the plaintiff." This latter assignment is based on the premise that summary proceedings were properly utilized in the case. The appellants in No. 58 (*Tribune Company et al. v. United States*) have one assignment of error to the effect that "The defendants are entitled to a trial of genuine issues of fact unmentioned in the findings of the court but which if found for the defendants would render this holding unwarranted." None of the appellants has pointed to any

---

[1] Rule 56 provides, "A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the pleading in answer thereto has been served, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

disputed facts essential to a determination of the validity or invalidity of the By-Laws and the contract. Admitting the existence of both the By-Laws and the contract, their answers and their affidavits in the summary proceedings defended the legality of the restrictive arrangements, but did not in any instance deny that non-members of AP were denied access to news of AP and of all of its member publishers by reason of the concerted arrangements between the appellants. Nor was it denied that the By-Laws granted AP members powers to impose restrictive conditions upon admission to membership of non-member competitors. The court below in making findings and entering judgment carefully abstained from the consideration of any evidence which might possibly be in dispute. We agree that Rule 56 should be cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of facts between them. *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U. S. 620. There was no injury to any of the appellants as a result of the summary proceedings since, for reasons to be indicated, the restrictive arrangements, which appellants admitted, were sufficient to justify summary action by the court at that stage of the case. In reaching our conclusion on the summary judgment question, we are not unmindful of the argument that newspaper publishers charged with combining cooperatively to violate the Sherman Act are entitled to have a different and more favorable kind of trial procedure than all other persons covered by the Act. No language in the Sherman Act or the summary judgment statute lends support to the suggestion. There is no single element in our traditional insistence upon an equally fair trial for every person from which any such discriminatory trial practice could stem. For equal—not unequal—justice under law is the goal of our society. Our legal system has not established different measures of proof for the trial of cases in which equally intelligent and respon-

sible defendants are charged with violating the same statutes. Member publishers of AP are engaged in business for profit exactly as are other business men who sell food, steel, aluminum, or anything else people need or want. See *International News Service* v. *Associated Press,* 248 U. S. 215, 229, 230. All are alike covered by the Sherman Act. The fact that the publisher handles news while others handle food does not, as we shall later point out, afford the publisher a peculiar constitutional sanctuary in which he can with impunity violate laws regulating his business practices.

Nor is a publisher who engages in business practices made unlawful by the Sherman Act entitled to a partial immunity by reason of the "clear and present danger" doctrine which courts have used to protect freedom to speak, to print, and to worship. That doctrine, as related to this case, provides protection for utterances themselves, so that the printed or spoken word may not be the subject of previous restraint or punishment, unless their expression creates a clear and present danger of bringing about a substantial evil which the government has power to prohibit. *Bridges* v. *California,* 314 U. S. 252, 261. Formulated as it was to protect liberty of thought and of expression, it would degrade the clear and present danger doctrine to fashion from it a shield for business publishers who engage in business practices condemned by the Sherman Act. Consequently, we hold that publishers, like all others charged with violating the Sherman Act, are subject to the provisions of the summary judgment statute. And that means that such judgments shall not be rendered against publishers or others where there are genuine disputes of fact on material issues. Accordingly, we treat the cause as did the court below, and will consider the validity of the By-Laws and the contract exclusively on the basis of their terms and the background of facts which the appellants admitted.

To put the issue into proper focus, it becomes necessary at this juncture to examine the By-Laws.

All members must consent to be bound by them. They impose upon members certain duties and restrictions in the conduct of their separate businesses. For a violation of the By-Laws severe disciplinary action may be taken by the Association. The Board of Directors may impose a fine of $1,000.00 or suspend a member and such "action . . . shall be final and conclusive. No member shall have any right to question the same." [2] The offending member may also be expelled by the members of the corporation for any reason "which in its absolute discretion it shall deem of such a character as to be prejudicial to the interests and welfare of the corporation and its members, or to justify such expulsion. The action of the regular members of the corporation in such regard shall be final and there shall be no right of appeal against or review of such action."

These By-Laws, for a violation of which members may be thus fined, suspended, or expelled, require that each

---

[2] The Directors who have this power to punish are elected by the members but each member does not have equal voting privileges in the election. The By-Laws grant one additional vote for each $25.00 of AP bonds held by a member. This means that in the election of Directors the owner of a $1,000.00 bond can cast 40 more votes than a member who owns no bonds. All members, however, do not and cannot under restrictive provisions of the By-Laws own an equal amount of bonds. In 1942, 99 out of 1,247 members owned blocks of bonds of the face value of $1,000.00 or more, totaling more than 50% of the outstanding bonds. The court below found on the undisputed evidence that the bondholder vote rather than the membership vote controls the selection of AP Directors. The Directors have power to apportion among the members the expenses of collecting and distributing news, and to levy assessments upon the members. As to this apportionment and levy the By-Laws provide that "There shall be no right to question the action of the Board of Directors in respect to such apportionment or assessments, either by appeal to a meeting of members, or otherwise, but the action of the Directors, when taken, shall be final and conclusive."

newspaper member publish the AP news regularly in whole or in part, and that each shall "promptly furnish to the corporation, through its agents or employees, all the news of such member's district, the area of which shall be determined by the Board of Directors." [3] All members are prohibited from selling or furnishing their spontaneous news to any agency or publisher except to AP. Other By-Laws require each newspaper member to conduct his or its business in such manner that the news furnished by the corporation shall not be made available to any non-member in advance of publication. The joint effect of these By-Laws is to block all newspaper non-members from any opportunity to buy news from AP or any of its publisher members. Admission to membership in AP thereby becomes a prerequisite to obtaining AP news or buying news from any one of its more than twelve hundred publishers. The erection of obstacles to the acquisition of membership consequently can make it difficult, if not impossible, for non-members to get any of the news furnished by AP or any of the individual members of this combination of American newspaper publishers.[4]

The By-Laws provide a very simple and non-burdensome road for admission of a non-competing applicant. The Board of Directors in such case can elect the applicant without payment of money or the imposition of any other onerous terms. In striking contrast are the By-Laws

---

[3] Another By-Law provides that "The news which a member shall furnish as herein required shall be all such news as is spontaneous in its origin, but shall not include any news that is not spontaneous in its origin, or which has originated through deliberate and individual enterprise on the part of such member of the newspaper specified in such member's certificate of membership."

[4] The court found that out of the 1,803 daily English language newspapers published in the United States, with a total circulation of 42,080,391, 1,179 of them, with a circulation of 34,762,120, were under joint contractual obligations not to supply either AP or their own "spontaneous" news to any non-member of AP.

which govern admission of new members who do compete. Historically, as well as presently, applicants who would offer competition to old members have a hard road to travel. This appears from the following facts found by the District Court.

AP originally functioned as an Illinois corporation, and at that time an existing member of the Association had an absolute veto power over the applications of a publisher who was or would be in competition with the old member. The Supreme Court of Illinois held that AP, thus operated, was in restraint of trade. *Inter-Ocean Publishing Co.* v. *Associated Press*, 184 Ill. 438, 56 N. E. 822. As a result of this decision, the present Association was organized in New York. Under the new By-Laws, the unqualified veto power of the Illinois AP members was changed into a "right of protest" which, when exercised, prevented the AP directors from electing the applicants as in other cases. The old member's protest against his competitor's application could then be overruled only by the affirmative vote of four-fifths of all the members of AP.

In 1931, the By-Laws were amended so as to extend the right of protest to all who had been members for more than 5 years and upon whom no right of protest had been conferred by the 1900 By-Laws. In 1942, after complaints to the Department of Justice had brought about an investigation, the By-Laws were again amended. These By-Laws, presently involved, leave the Board of Directors free to elect new members unless the applicant would compete with old members, and in that event the Board cannot act at all in the absence of consent by the applicant's member competitor. Should the old member object to admission of his competitor, the application must be referred to a regular or special meeting of the Association. As a prerequisite to election, he must (a) pay to the Association 10% of the total amount of the regular assessments received by it from old members in the same

competitive field during the entire period from October 1, 1900 to the first day of the month preceding the date of the election of the applicant,[5] (b) relinquish any exclusive rights the applicant may have to any news or news picture services and, when requested to do so by his member competitor in that field, must "require the said·news or news picture services, or any of them, to be furnished to such member or members, upon the same terms as they are made available to the applicant," and (c) receive a majority vote of the regular members who vote in person or by proxy. These obstacles to membership, and to the purchase of AP news, only existed where there was a competing old member in the same field.

The District Court found that the By-Laws in and of themselves were contracts in restraint of commerce [6] in that they contained provisions designed to stifle competition in the newspaper publishing field.[7] The court also

---

[5] Under these terms, a new applicant could not have entered the morning field in New York without paying $1,432,142.73, and in Chicago, $416,631.90. For entering the evening field in the same cities it would have cost $1,095,003.21, and $595,772.31, respectively.

[6] "The by-laws of AP are in effect agreements between the members: that one which restricts AP to the transmission of news to members, and that which restricts any member to transmitting 'spontaneous' news to the association, are both contracts in restraint of commerce. They restrict commerce because they limit the members' freedom to relay any news to others, either the news they learn themselves, or that which they learn collectively through AP as their agent." *United States* v. *Associated Press*, 52 F. Supp. 362, 368.

[7] The District Court found that, among all the news-gathering agencies in the United States, AP ranked "in the forefront in public reputation and esteem" and that it was "the chief single source of news for the American press, universally agreed to be of great consequence"; that the combination of AP owners acted together for the purpose of using the news-gathering facilities of the individual publishers and of the combination, which news was made available to members and denied to others; and that the restrictive By-Laws had been observed, carried out, and applied in practice. The court declared that the conditions which old members could impose upon

found that AP's restrictive By-Laws had hindered and impeded the growth of competing newspapers.[8] This latter finding, as to the *past* effect of the restrictions, is challenged. We are inclined to think that it is supported by undisputed evidence, but we do not stop to labor the point. For the court below found, and we think correctly, that the By-Laws on their face, and without regard to their past effect, constitute restraints of trade. Combinations are no less unlawful because they have not as yet resulted in restraint. An agreement or combination to follow a course of conduct which will necessarily restrain or monopolize a part of trade or commerce may violate the Sherman Act, whether it be "wholly nascent or abortive on the one hand, or successful on the other."[9] For

new applicants for membership were "plainly designed in the interest of preventing competition," and that the requirement of payments from new members to competing old members "were designed to compensate competitors for the loss in value of their membership, arising out of the applicant's improved position as a competitor." The court pointed out that these restrictive provisions would "act as a deterrent," and might "prove a complete bar to the admission of any applicant."

[8] That finding is as follows: "The growth of news agencies has been fostered to some extent as a result of the restrictions of The Associated Press' services to its own members, but other restrictions imposed by The Associated Press have hampered and impeded the growth of competing news agencies and of newspapers competitive with members of The Associated Press."

The court's opinion, and its findings as a whole, show that the "other restrictions" found to have hampered competition were those relating to admissions to membership in AP and to restraints upon a member's freedom to sell his news.

[9] *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 225. See also *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 402; *Fashion Originators' Guild* v. *Federal Trade Commission,* 312 U. S. 457, 466; *United States* v. *Patten,* 226 U. S. 525, 543; *Paramount Famous Corp.* v. *United States,* 282 U. S. 30, 41; *Standard Oil Co.* v. *United States,* 221 U. S. 1, 65–66.

these reasons the argument, repeated here in various forms, that AP had not yet achieved a complete monopoly is wholly irrelevant. Undisputed evidence did show, however, that its By-Laws had tied the hands of all of its numerous publishers, to the extent that they could not and did not sell any part of their news so that it could reach any of their non-member competitors. In this respect the court did find, and that finding cannot possibly be challenged, that AP's By-Laws had hindered and restrained the sale of interstate news to non-members who competed with members.

Inability to buy news from the largest news agency, or any one of its multitude of members, can have most serious effects on the publication of competitive newspapers, both those presently published and those which, but for these restrictions, might be published in the future.[10] This is illustrated by the District Court's finding that, in 26 cities of the United States, existing newspapers already have contracts for AP news and the same newspapers have contracts with United Press and International News Service under which new newspapers would be required to pay the contract holders large sums to enter the field.[11] The net effect is seriously to limit the opportunity of any new paper to enter these cities. Trade restraints of this character, aimed at the destruction of competition, tend to block the initiative which brings newcomers into a field

[10] The District Court found as a fact that "It is practically impossible for any one newspaper alone to establish or maintain the organization requisite for collecting all of the news of the world, or any substantial part thereof; aside from the administrative and organization difficulties thereof, the financial cost is so great that no single newspaper acting alone could sustain it."

[11] INS and UP make so-called "asset value" contracts under which if another newspaper wishes to obtain their press services, the newcomer shall pay to the competitor holding the UP or INS contract the stipulated "asset value."

of business and to frustrate the free enterprise system which it was the purpose of the Sherman Act to protect.[12]

We need not again pass upon the contention that trade in news carried on among the states is not interstate commerce, *Associated Press* v. *Labor Board,* 301 U. S. 103, or that because AP's activities are cooperative, they fall outside the sphere of business, *American Medical Assn.* v. *United States,* 317 U. S. 519, 528. It is significant that when Congress has desired to permit cooperatives to interfere with the competitive system of business, it has done so expressly by legislation.[13]

Nor can we treat this case as though it merely involved a reporter's contract to deliver his news reports exclusively to a single newspaper, or an exclusive agreement as to news between two newspapers in different cities. For such trade restraints might well be "reasonable," and therefore not in violation of the Sherman Act. *Standard Oil Co.* v. *United States,* 221 U. S. 1. But however innocent such agreements might be, standing alone, they would assume quite a different aspect if utilized as essential features of a program to hamper or destroy competition. It is in this light that we must view this case.

It has been argued that the restrictive By-Laws should be treated as beyond the prohibitions of the Sherman Act, since the owner of the property can choose his associates and can, as to that which he has produced by his own enterprise and sagacity, efforts or ingenuity, decide for

---

[12] *Paramount Famous Corp.* v. *United States, supra,* 42, quoted *United States* v. *Colgate & Co.,* 250 U. S. 300, 307, to the following effect: " 'The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade.' "

[13] See e. g., 7 U. S. C. 291, 292, as to farm cooperatives; 15 U. S. C. 17, as to labor organizations. But see also as to the latter, *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 487–498.

himself whether and to whom to sell or not to sell. While it is true in a very general sense that one can dispose of his property as he pleases, he cannot "go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade." *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, 722. The Sherman Act was specifically intended to prohibit independent businesses from becoming "associates" in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete. Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with the Sherman Act or with practical, everyday knowledge be attributed to *individual* "enterprise and sagacity"; such hampering of business rivals can only be attributed to that which really makes it possible—the collective power of an unlawful combination. That the object of sale is the creation or product of a man's ingenuity does not alter this principle. *Fashion Originators' Guild* v. *Federal Trade Commission,* 312 U. S. 457.[14] It is obviously fallacious to view the By-

[14] It is argued that the decision in *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, requires a holding that these arrangements are consistent with the Sherman Act. In that case, the Board of Trade gathered "quotations" of the prices on sales of grain for future delivery and sold the "information" under agreements forbidding the purchasers to reveal it. The Board of Trade filed suit to prevent its purchasers from breaking this agreement by transmitting the statistics to a "bucket shop or place where they are used as a basis for bets or illegal contracts," p. 246. It was said in the opinion that the statistics were in the nature of a "trade secret." The opinion stated that the Board's collection of statistical information was entitled to the protection of the laws; that it had a right to keep it to itself, and that it did not "lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of

Laws here in issue as instituting a program to encourage
and permit full freedom of sale and disposal of property
by its owners. Rather, these publishers have, by con-
certed arrangements, pooled their power to acquire, to
purchase, and to dispose of news reports through the chan-
nels of commerce. They have also pooled their economic
and news control power and, in exerting that power, have
entered into agreements which the District Court found
to be "plainly designed in the interest of· preventing
competition." [15]

---

trust and using knowledge obtained by such a breach." Of course,
one who has created or acquired something of value has a general
right to use it according to the dictates of his own discretion, but this
right of ownership is measured by the limitations of law, and the
Sherman Act which obviously restricts the free and untrammeled use
of property, in the public interest, is a clear and pointed instance
of the non-absolute character of property rights. An argument to
the contrary was expressly rejected in *Fashion Originators' Guild* v.
*Federal Trade Commission, supra*, 467, 468.

Furthermore, the contracts involved in the *Christie* case were "not
relied on as a cause of action." This Court found that those contracts
did not show a purpose to deny sale of the statistics to non-members
of the Board of Trade. Whether such a contractual restriction would
have violated the Sherman Act, the Court refused to decide. In the
instant case, as we have pointed out, both the individual publishers
and AP have bound themselves to furnish their news to each other
and to deny it to all others. Two later cases repeated the statement
as to the right of one who gathered statistics to sell them on conditions.
Neither of them, however, decided that such restrictive arrangements
as appear in the instant case would not constitute unreasonable
restraints of trade. *Moore* v. *N. Y. Cotton Exchange*, 270 U. S. 593;
*Hunt* v. *N. Y. Cotton Exchange*, 205 U. S. 322.

[15] Even if additional purposes were involved, it would not justify
the combination, since the Sherman Act cannot "be evaded by good
motives. The law is its own measure of right and wrong, of what it
permits, or forbids, and the judgment of the courts cannot be set up
against it in a supposed accommodation of its policy with the good
intention of parties, and it may be, of some good results." *Standard
Sanitary Mfg. Co.* v. *United States*, 226 U. S. 20, 49.

It is further contended that since there are other news agencies which sell news, it is not a violation of the Act for an overwhelming majority of American publishers to combine to decline to sell their news to the minority. But the fact that an agreement to restrain trade does not inhibit competition in all of the objects of that trade cannot save it from the condemnation of the Sherman Act.[16] It is apparent that the exclusive right to publish news in a given field, furnished by AP and all of its members, gives many newspapers a competitive advantage over their rivals.[17] Conversely, a newspaper without AP service is

[16] *United States* v. *Socony-Vacuum Oil Co., supra*, 221, 224.

This Court said in *Paramount Famous Corp.* v. *United States, supra*, 44, "In order to establish violation of the Sherman Act it is not necessary to show that the challenged arrangement suppresses all competition between the parties or that the parties themselves are discontented with the arrangement. The interest of the public in the preservation of competition is the primary consideration." Again, in *Fashion Originators' Guild* v. *Federal Trade Commission, supra*, 466, we said, "Nor is it determinative in considering the policy of the Sherman Act that petitioners may not yet have achieved a complete monopoly. For 'it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition.' *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 16; *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, 237." See also *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 485.

[17] The District Court pointed out that, "monopoly is a relative word. If one means by it the possession of something absolutely necessary to the conduct of an activity, there are few except the exclusive possession of some natural resource without which the activity is impossible. Most monopolies, like most patents, give control over only some means of production for which there is a substitute; the possessor enjoys an advantage over his competitors, but he can seldom shut them out altogether; his monopoly is measured by the handicap he can impose. . . . And yet that advantage alone may make a monopoly unlawful. It would be possible, for instance, to conduct some kind of a newspaper without any news service whatever; but nobody will maintain that, if AP were the only news service in existence, the members could keep it wholly to themselves and reduce all other papers to such news as they could gather by their own efforts." *United States* v. *Associated Press*, 52 F. Supp. 362, 371.

more than likely to be at a competitive disadvantage. The District Court stated that it was to secure this advantage over rivals that the By-Laws existed. It is true that the record shows that some competing papers have gotten along without AP news, but morning newspapers, which control 96% of the total circulation in the United States, have AP news service. And the District Court's unchallenged finding was that "AP is a vast, intricately reticulated organization, the largest of its kind, gathering news from all over the world, the chief single source of news for the American press, universally agreed to be of great consequence."

Nevertheless, we are asked to reverse these judgments on the ground that the evidence failed to show that AP reports, which might be attributable to their own "enterprise and sagacity," are clothed "in the robes of indispensability." The absence of "indispensability" is said to have been established under the following chain of reasoning: AP has made its news generally available to the people by supplying it to a limited and select group of publishers in the various cities; therefore, it is said, AP and its member publishers have not deprived the reading public of AP news; all local readers have an "adequate access" to AP news, since all they need do in any city to get it is to buy, on whatever terms they can in a protected market, the particular newspaper selected for the public by AP and its members. We reject these contentions. The proposed "indispensability" test would fly in the face of the language of the Sherman Act and all of our previous interpretations of it. Moreover, it would make that law a dead letter in all fields of business, a law which Congress has consistently maintained to be an essential safeguard to the kind of private competitive business economy this country has sought to maintain.

The restraints on trade in news here were no less than those held to fall within the ban of the Sherman Act with

reference to combinations to restrain trade outlets in the sale of tiles, *Montague & Co.* v. *Lowry,* 193 U. S. 38; or enameled ironware, *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 48–49; or lumber, *Eastern States Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, 611; or women's clothes, *Fashion Originators' Guild* v. *Federal Trade Commission, supra;* or motion pictures, *United States* v. *Crescent Amusement Co.,* 323 U. S. 173. Here as in the *Fashion Originators' Guild* case, *supra,* 465, "the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.' *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 242." By the restrictive By-Laws each of the publishers in the combination has, in effect, "surrendered himself completely to the control of the association," *Anderson* v. *Shipowners Assn.,* 272 U. S. 359, 362, in respect to the disposition of news in interstate commerce. Therefore this contractual restraint of inter-state trade, "designed in the interest of preventing com-petition," cannot be one of the "normal and usual agree-ments in aid of trade and commerce which may be found not to be within the [Sherman] Act . . ." *Eastern States Lumber Dealers' Assn.* v. *United States, supra,* 612, 613. It is further said that we reach our conclusion by application of the "public utility" concept to the newspa-per business. This is not correct. We merely hold that arrangements or combinations designed to stifle compe-tition cannot be immunized by adopting a membership device accomplishing that purpose.

Finally, the argument is made that to apply the Sherman Act to this association of publishers constitutes an abridg-ment of the freedom of the press guaranteed by the First Amendment. Perhaps it would be a sufficient answer to

this contention to refer to the decisions of this Court in *Associated Press* v. *Labor Board, supra,* and *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.,* 293 U. S. 268. It would be strange indeed, however, if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests.[18] The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity.

---

[18] It is argued that the decree interferes with freedom "to print as and how one's reason or one's interest dictates." The decree does not compel AP or its members to permit publication of anything which their "reason" tells them should not be published. It only provides that after their "reason" has permitted publication of news, they shall not, for their own financial advantage, unlawfully combine to limit its publication. The only compulsion to print which appears in the record is found in the By-Laws, previously set out, which compel members of the Association to print some AP news or subject themselves to fine or expulsion from membership in the Association.

We now turn to the decree. Having adjudged the By-Laws imposing restrictions on applications for membership to be illegal, the court enjoined the defendants from observing them, or agreeing to observe any new or amended By-Law having a like purpose or effect. It further provided that nothing in the decree should prevent the adoption by the Associated Press of new or amended By-Laws "which will restrict admission, provided that members in the same city and in the same 'field' (morning, evening or Sunday), as an applicant publishing a newspaper in the United States of America or its Territories, shall not have power to impose, or dispense with, any conditions upon his admission and that the By-Laws shall affirmatively declare that the effect of admission upon the ability of such applicant to compete with members in the same city and 'field' shall not be taken into consideration in passing upon his application." Some of appellants argue that this decree is vague and indefinite. They argue that it will be impossible for the Association to know whether or not its members took into consideration the competitive situation in passing upon applications for membership. We cannot agree that the decree is ambiguous. We assume, with the court below, that AP will faithfully carry out its purpose. Interpreting the decree to mean that AP news is to be furnished to competitors of old members without discrimination through By-Laws controlling membership, or otherwise, we approve it.

The court also held that, taken in connection with the restrictive clauses on admissions to membership, those sections of the By-Laws violated the Sherman Act which prevented service of AP news to non-members and prevented AP members from furnishing spontaneous news to anyone not a member of the Association. It held the agreement between AP and the Canadian Press, under which AP secured exclusive right to receive the news re-

ports of the Canadian Press and its members, was also, when taken in connection with the restrictive membership agreements, in violation of the Sherman Act. It declined to hold these By-Laws and the agreement with Canadian Press illegal standing by themselves. It consequently enjoined their observance temporarily, pending AP's obedience to the decree enjoining the restrictive membership agreements. The court's findings justified this phase of its injunction. *United States* v. *Bausch & Lomb Co., supra,* 724.

The government has appealed from the court's refusal to hold each of these last-mentioned items a violation of the Sherman Act standing alone. The government also asks that the decree of the District Court be broadened, so as permanently to enjoin observance of the Canadian Press contract and all the challenged By-Laws. It also suggests certain specific terms which should be added to the decree to assure the complete eradication of AP's discrimination against competitors of its members.

The fashioning of a decree in an antitrust case in such way as to prevent future violations and eradicate existing evils, is a matter which rests largely in the discretion of the court. *United States* v. *Crescent Amusement Co., supra.* A full exploration of facts is usually necessary in order properly to draw such a decree. In this case the government chose to present its case on the narrow issues which were within the realm of undisputed facts. In the situation thus narrowly presented we are unable to say that the court's decree should have gone further than it did. Furthermore, the District Court retained the cause for such further proceedings as might become necessary. If, as the government apprehends, the decree in its present form should not prove adequate to prevent further discriminatory trade restraints against non-member newspapers, the court's retention of the cause will enable it

to take the necessary measures to cause the decree to be fully and faithfully carried out.

The judgment in all three cases is

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

I join in the opinion of the Court. But in view of the broader issues which have been injected into the discussion of the case, I add a few words to indicate what I deem to be the narrow compass of the decision.

Every exclusive arrangement in the business or commercial field may produce a restraint of trade. A manufacturer who has only one retail outlet for his product may be said to restrain trade in the sense that other retailers are prevented from dealing in the commodity. And to a degree, the same kind of restraint may be found wherever a reporter is gathering news exclusively for one newspaper. But *Standard Oil Co.* v. *United States,* 221 U. S. 1, construed the Sherman Act to include not every restraint but only those which were unreasonable. Starting from that premise, I assume that it would not be a violation of the Sherman Act if a newspaper in Seattle and one in New York made an agency agreement whereby each was to furnish exclusively to the other news reports from his locality.

But such an exclusive arrangement, though innocent standing alone, might be part of a scheme which would violate the Sherman Act in one of two respects.

(1) It might be a part of the machinery utilized to effect a restraint of trade in violation of § 1 of the Act. Cf. *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707. I think the exclusive arrangement employed by the Associated Press had such a necessary effect. As developed in the opinion of the Court, the by-laws of the Associated

Press were aimed at the competitors of the Associated Press' members; their necessary effect was to hinder or impede competition with members of the combination. The District Court not only ordered the by-laws to be revised; it enjoined continuance of the exclusive arrangement until the restraint effected by the by-laws had been eliminated. That was plainly within its power. For it is well settled that a feature of an illegal restraint of trade, which is innocent by itself and which may be lawfully used if independently established, may be uprooted along with the other parts of an illegal arrangement. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 461; *United States* v. *Univis Lens Co.,* 316 U. S. 241, 254. We certainly cannot say that the District Court abused its discretion in adopting that course here as an interim measure pending a revision of the by-laws.

(2) Such an exclusive arrangement as we have here might result in the growth of a monopoly in the furnishing of news, in the access to news, or in the gathering or distribution of news. Those are business activities subject to the Sherman Act (*Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.,* 293 U. S. 268) as well as other Acts of Congress regulating interstate commerce. *Associated Press* v. *Labor Board,* 301 U. S. 103. The District Court found that in its present stage of development the Associated Press had no monopoly of that character. Those findings are challenged here in the appeal taken by the United States. They are not reached in the present decision for the reason, discussed in the opinion of the Court, that they cannot be tried out on a motion for a summary judgment. The decree which we approve does not direct Associated Press to serve all applicants. It goes no further than to put a ban on Associated Press' practice of discriminating against competitors of its members in the same field or territory. That entails not only a discontinuance of the practice for the future but an undoing of the wrong which has been

done. If Associated Press, after the effects of that discrimination have been eliminated, freezes its membership at a given level, quite different problems would be presented. Whether that would result in a monopoly in violation of § 1 of the Act is distinct from the issue in this case.

Only if a monopoly were shown to exist would we be faced with the public utility theory which has been much discussed in connection with this case and adopted by Mr. Justice Frankfurter. The decrees under the Sherman Act directed at monopolies have customarily been designed to break them up or dissolve them. See *United States* v. *Crescent Amusement Co.*, 323 U. S. 173. There have been some exceptions. Thus in *United States* v. *Terminal Railroad Assn.*, 224 U. S. 383, an action was brought under the Sherman Act to dissolve a combination among certain railroads serving St. Louis. The combination had acquired control of all available facilities for connecting railroads on the east bank of the Mississippi with those on the west bank. The Court held that as an alternative to dissolution a plan should be submitted which provided for equality of treatment of all railroads. And see *United States* v. *Great Lakes Towing Co.*, 208 F. 733, 747, 217 F. 656, appeal dismissed, 245 U. S. 675. *United States* v. *New England Fish Exchange*, 258 F. 732. Whether that procedure would be appropriate in this type of case or should await further legislative action (cf. Mr. Justice Brandeis' dissenting opinion, *International News Service* v. *Associated Press*, 248 U. S. 215, 248, 262) is a considerable question, the discussion of which should not cloud the present decision. What we do today has no bearing whatsoever on it.

Mr. Justice Frankfurter, concurring.

The District Court properly applied the Sherman Law in enjoining the defendants from continuing to enforce

the existing by-laws restricting membership in the Associated Press, and further enjoining the enforcement of another restrictive by-law forbidding Associated Press members to communicate "spontaneous" news to non-members. I would sustain the judgment substantially for the reasons given below by Judge Learned Hand. 52 F. Supp. 362.

The Associated Press is in essence the common agent of about 1,300 newspapers in the various cities throughout the country for the interchange of news which each paper collects in its own territory, and for the gathering, editing, and distributing of news which these member papers cannot collect single-handed, and which requires their pooled resources. The historic development of this agency, its world-wide scope, the pervasive influence it exerts in obtaining and disseminating information, the country's dependence upon it for news of the world—all these are matters of common knowledge and have been abundantly spread upon the records of this Court. *International News Service* v. *Associated Press,* 248 U. S. 215; *Associated Press* v. *Labor Board,* 301 U. S. 103. See Desmond, The Press and World Affairs (1937) Chapters I, II, III.

The by-laws in controversy operate in substance as a network of agreements among the members of the Associated Press whereby they mobilize the interest of all against the danger of competition to each by a present or future rival—to the extent that inability to obtain an Associated Press "franchise" is a serious factor in the competition between papers in the same city. While a member newspaper no longer has an absolute veto power in the denial of facilities of the Associated Press service to a rival paper applying for membership, for practical purposes there remain effective barriers to admission to the Associated Press based solely on grounds of business competition. As Judge Learned Hand has pointed out, the abatement in the by-law from a former absolute veto to a

conditional veto against an applicant competing with an existing member "by no means opened membership to all those who would be entitled to it, if the public has an interest in its being free from exclusion for competitive reasons, and if that interest is paramount. Although, as we have said, only a few members will have any direct personal interest in keeping out an applicant, the rest will not feel free to judge him regardless of the effect of his admission on his competitors. Each will know that the time may come when he will himself be faced with the application of a competitor . . . A by-law which leaves it open to members to vote solely as their self-interest may dictate, disregards whatever public interest may exist." 52 F. Supp. 362, 370–371.

Indubitably, then, we have here arrangements whereby members of the Associated Press bind one another from selling local news to non-members and exercise power, which reciprocal self-interest invokes, to help one another in keeping out competitors from membership in the Associated Press, with all the advantages that it brings to a newspaper. Since the Associated Press is an enterprise engaged in interstate commerce, *Associated Press* v. *Labor Board, supra,* these plainly are agreements in restraint of that commerce. But ever since the Sherman Law was saved from stifling literalness by "the rule of reason," *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106; it is not sufficient to find a restraint. The decisive question is whether it is an unreasonable restraint. This depends, in essence, on the significance of the restraint in relation to a particular industry. Compare *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238.

To be sure, the Associated Press is a cooperative organization of members who are "engaged in a commercial business for profit." *Associated Press* v. *Labor Board, supra,* at 128. But in addition to being a commercial

enterprise, it has a relation to the public interest unlike that of any other enterprise pursued for profit. A free press is indispensable to the workings of our democratic society. The business of the press, and therefore the business of the Associated Press, is the promotion of truth regarding public matters by furnishing the basis for an understanding of them. Truth and understanding are not wares like peanuts or potatoes. And so, the incidence of restraints upon the promotion of truth through denial of access to the basis for understanding calls into play considerations very different from comparable restraints in a cooperative enterprise having merely a commercial aspect. I find myself entirely in agreement with Judge Learned Hand that "neither exclusively, nor even primarily, are the interests of the newspaper industry conclusive; for that industry serves one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as is possible. That interest is closely akin to, if indeed it is not the same as, the interest protected by the First Amendment; it presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." 52 F. Supp. 362, 372.

From this point of view it is wholly irrelevant that the Associated Press itself has rival news agencies. As to ordinary commodities, agreements to curtail the supply and to fix prices are in violation of the area of free enterprise which the Sherman Law was designed to protect. The press in its commercial aspects is also subject to the regulation of the Sherman Law. *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.*, 293 U. S. 268. But the freedom of enterprise protected by the Sherman Law necessarily has different aspects in relation to the press than in the case of ordinary commercial pursuits. The interest of

the public is to have the flow of news not trammeled by the combined self-interest of those who enjoy a unique constitutional position precisely because of the public dependence on a free press.  A public interest so essential to the vitality of our democratic government may be defeated by private restraints no less than by public censorship.

Equally irrelevant is the objection that it turns the Associated Press into a "public utility" to deny to a combination of newspapers the right to treat access to their pooled resources as though they were regulating membership in a social club.  The relation of such restraints upon access to news and the relation of such access to the function of a free press in our democratic society must not be obscured by the specialized notions that have gathered around the legal concept of "public utility."

The short of the matter is that the by-laws which the District Court has struck down clearly restrict the commerce which is conducted by the Associated Press, and the restrictions are unreasonable because they offend the basic functions which a constitutionally guaranteed free press serves in our nation.

MR. JUSTICE ROBERTS.

I think the judgment should be reversed.  In respect of most of the questions involved I might rest on the discussion by Judge Swan in his dissenting opinion in the District Court.  The novelty and importance of the questions, and the summary disposition of them in the court's opinion, have, however, moved me to state my views in detail.

This case deals with "news."  News is information about matters of general interest.  The term has been defined as "a report of a recent event."  The report may be made to one moved by curiosity or to one who wishes to make some

practical use of it. Newspapers obtain such reports and publish them as a part of a business conducted for profit. The proprietor of a newspaper, when he employs a person to inquire and report, engages personal service. I suppose no one would deny that he is entitled to the exclusive use of the report rendered as a result of the service for which he contracts and pays. I suppose that one rendering such service is free to contract with his employer that the product of his inquiries—the news he furnishes his employer—shall be used solely by the employer and not imparted to another.

As I have said, news is the result of effort in the investigation of recent events. Every newspaper is interested in procuring news of happenings in its vicinity, and maintains a staff for that purpose. Such news may have some value to newspapers published in cities outside the locality of the occurrence. I assume that if two publishers agreed that each should supply a transcript of all reports he received to the other, and conditioned their agreement that neither would abuse the privilege accorded, by giving away or selling what was furnished under the joint arrangement, there could be no objection under the Sherman Act. I had assumed, although the opinion appears to hold otherwise, that such an arrangement would not be obnoxious to the Sherman Act because many, rather than few, joined in it. I think that the situation would be no different if a machinery were created to facilitate the exchange of the news procured by each of the participants such as a partnership, an unincorporated association, or a non-profit corporation.

I assume it cannot be questioned that two or more persons desirous of obtaining news may agree to employ a single reporter, or a staff of reporters, to furnish them news, and agree amongst themselves that, as they share the expense involved, they themselves will use the fruit of

the service and will not give it away or sell it. Although the procedure has obvious advantages, and is in itself innocent, I do not know, from the opinion of the court, whether it would be held that the inevitable or necessary operation, or necessary consequence, of such an arrangement is to restrain competition in trade or commerce and that it is, consequently, illegal.[1] Many expressions in the opinion seem to recognize that all AP does is to keep for its members that which, at joint expense, its members and employees have produced,—its reports of world events. Thus it is said that nonmembers are denied access to AP news, not, be it observed, to news. Again it is said that the by-laws "block all newspaper nonmembers from any opportunity to buy news from AP or any of its publisher members"; again that "the erection of obstacles to the acquisition of membership . . . can make it difficult, if not impossible, for nonmembers to get any of the news furnished by AP . . ." If these expressions stood alone as the factual basis of decision we should know that the court is condemning a joint enterprise for the production of something—here, news copy—which those who produce it intend to use for their exclusive benefit. But it is impossible to deduce from the opinion that this is the ratio of decision.

I do not understand that the court's decision is pitched on the fact that AP is a membership corporation. The same result could be attained by resort to a multi-party contract, to a partnership, or to an unincorporated association. The choice of the form of the cooperative

---

[1] The argument drawn from the Congressional exemption of farmers' cooperatives from the sweep of the Sherman Act falls short, since such cooperatives often are not mere joint purchasing agencies of things needed and used by the members, but are marketing agencies which may be thought to restrain commerce and tend toward monopoly. It was to safeguard the latter sort of activity that the exemption was granted.

enterprise does not affect the nature of the problem presented.[2]

AP was created to accomplish on a mutual, nonprofit, basis the two objects mentioned. Its purpose is stated by its charter as "the collection and interchange, with greater economy and efficiency, of information and intelligence for publication in the newspapers" of its members. The organization started on a comparatively modest basis, to facilitate exchange of news reports amongst its members. It has grown into a cooperatively maintained news reporting agency having, in addition, its own reporters and agencies for the collection, arrangement, editing, and transmission to its members, of news, gathered by its employees, and those of others with whom it contracts.

The question is whether the Sherman Act precludes such a cooperative arrangement and renders those who participate liable to furnish news copy, on equal terms, to all newspapers which desire it, as the court below has held. If so, it must be because the joint arrangement constitutes a contract, combination or conspiracy in restraint of trade, or a monopolization, or an attempt or combination or conspiracy to monopolize part or all of some branch of interstate or international trade or commerce, or is a public utility subject to regulation. If AP's activities fall within the denunciation of the statute it must be because the members (1) have combined with the purpose to restrain trade by destroying competition; or (2), even though their intent was innocent, have set up a combination which either (a) tends unreasonably to restrain, or (b) has in fact resulted, in undue and unreasonable restraint of free competition in trade or commerce; or (3) intended and attempted to monopolize a part or all of a branch of trade;

---

[2] "A cooperative enterprise, otherwise free from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint . . ." *Appalachian Coals* v. *United States*, 288 U. S. 344, 373–4.

or (4) have created an organization of such proportions that in fact it has such a monopoly; or (5) have created an agency which the Sherman Act renders a public utility subject to regulation notwithstanding the guarantees of the First Amendment of the Constitution.

I am unable to determine on which of such possible grounds the judgment of illegality is rested. The court's opinion blends and mingles statements of fact, inferences and conclusions, and quotations from prior opinions wrested from their setting and context, in such fashion that I find it impossible to deduce more than that orderly analysis and discussion of facts relevant to any one of the possible methods of violation of the Sherman Act is avoided, in the view that separate consideration would disclose a lack of support for any finding of specific wrongdoing. But the general principle that nothing added to nothing will not add up to something holds true in this case. It is a tedious task to separate the generalities thus mingled in the opinion, but I can only essay it by discussing one aspect of the case at a time.

*In limine*, it should be remembered that newspaper proprietors who are members of AP are not, as publishers, in the trade of buying or selling news. Their business is the publishing of newspapers. In this business they print *inter alia* news, editorial comment, special articles, photographs, and advertisements. It has been held that a joint effort to obtain advertising to be published in all the papers parties to the arrangement, at special rates, is not a violation of the Sherman Act.[3] It has been repeatedly held by this court that the collection of information on behalf of the membership of an unincorporated association, and the furnishing of that information for pay to such persons as the association decides shall share it, is not a violation of

---

[3] *Prairie Farmer Co.* v. *Indiana Farmer's Guide Co.*, 88 F. 2d 979, cert. denied 301 U. S. 696; rehearing denied 302 U. S. 773.

the Sherman Act.[4]   I think this is not because the exclusive right to use information or news copy obtained differs somewhat from property rights in tiles or lumber or pipe or women's fashions or motion-picture film.   I think it is because information gathered as the result of effort, or of compensation paid the gatherer, is protected as is property, until published; and that unauthorized publication by another is a wrong redressible in the same way as unauthorized interference with one's rights in tangible property. In the very case of AP, this court has so held,[5] as has the Attorney General of the United States.[6]   As the Attorney General has pointed out, this proposition is subject to the qualification that there must be no purpose to destroy competition or to monopolize, but with these matters I shall deal hereafter.

*First.*   Are the members of AP acting together with the *purpose* of destroying competition?   I have not discovered any allegation in the complaint to that effect.   The court below has not made any such finding.   They deny any such purpose or intent and yet, as I read passages in the court's opinion, it is now found, on this summary judgment record, without a trial, that they are, and have been, actuated by such an intent.   The opinion states: "An

[4] *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 251, 252; *Hunt* v. *New York Cotton Exchange,* 205 U. S. 322, 333; *United States* v. *New York Coffee Exchange,* 263 U. S. 611, 619; *Moore* v. *New York Cotton Exchange,* 270 U. S. 593, 604, 607.

[5] *International News Service* v. *Associated Press,* 248 U. S. 215.

[6] " . . . it is no violation of the Anti-Trust Act for a group of newspapers to form an association to collect and distribute news for their common benefit, and to that end to agree to furnish the news collected by them only to each other or to the Association; provided that no attempt is made to prevent the members from purchasing or otherwise obtaining news from rival agencies.   And if that is true the corollary must be true, namely, that newspapers desiring to form and maintain such an organization may determine who shall be and who shall not be their associates." (Letter of Attorney General Gregory of March 12, 1915.)

agreement or combination to follow a course of conduct which will necessarily restrain or monopolize a part of trade or commerce may violate the Sherman Act, whether it be 'wholly nascent or abortive on the one hand, or successful on the other.' " I take this statement as suggesting the pleadings and proof disclose, without contradiction, that AP and its members agreed or combined to restrain trade. There is no such allegation in the complaint, and there is not, and cannot be, any finding on this record to support the conclusion. The cases cited in the opinion of agreements to boycott or to drive competitors out of business, or to compel merchants to deal only with members of a group, are, as will appear, inapposite to the case at bar. The defendants say that they merely keep for their own members' use that which their own members' activity and expenditure has produced. We must not confuse the intent of the members with the size of their organization. These two matters seem to be inextricably blended in the court's treatment of the case, but they differ in their nature and as a basis for decision.

But, it may be urged, intent is to be gathered from conduct, and those whose actions have in fact unduly restrained trade, will not be heard to deny the purpose to accomplish the result of their conduct. This is sound doctrine, and it leads to an inquiry as to the actual imposition of prohibited restraints.

*Second.* Has the plan, and have the operations of AP, the inevitable consequence of restraining competition between news agencies or newspapers, or have they, and do they now, necessarily tend to, or in fact, unreasonably restrain such competition? On this question the court below made no findings save one of dubious import.

It is worth while to quote the finding to which the opinion of this court refers:

"The growth of news agencies has been fostered to some extent as a result of the restrictions of The Associated

Press' services to its own members, but *other restrictions* imposed by The Associated Press have hampered and impeded the growth of competing news agencies and of newspapers competitive with members of The Associated Press." (Italics supplied.)

The finding is vague for it fails to specify what is meant by "other restrictions." The phrase cannot mean the membership restrictions of the by-laws for those are mentioned in the preceding clause. Nor does this court's opinion furnish any additional light.

Not only is the finding attacked, as the court's opinion admits, but, in addition, the record negatives the sweeping assumptions the court indulges respecting the effect of AP's activities.

The opinion states that the members "have, by concerted arrangements, pooled their power to acquire, to purchase, and to dispose of news reports through the channels of commerce," and, in addition, have "pooled their economic and news control power and, in exerting that power, have entered into agreements which the District Court found to be 'plainly designed in the interest of preventing competition.'" This sentence is characteristic of the opinion. In the first place, as will later appear, the record presents no question of "purchasing power." One cannot purchase the events of history; he can employ someone to report them to him. Does the sentence mean that AP has "purchased" all or most of the available reporters in the nation or the world? Secondly, the sentence seems to attribute to AP some sort of monopolization of the newspaper publishing business. And, finally, it seems to attribute to the court below a finding that AP has unduly or unreasonably restrained trade. As will appear, the court below made no such finding and, because it could not do so, sought another ground on which to base its decision. Moreover, the facts assumed are specifically denied by the answer, and contradicted by the proofs.

The uncontradicted proofs to which I shall later refer show that nonmember publishers not only have obtained, and now obtain, complete and satisfactory news coverage from other agencies, but have prospered and grown without AP news service.

It is said in the opinion that the by-laws, as obstacles to membership, tend to make it difficult to obtain news furnished by AP or its members and that it is apparent that the exclusive right which AP members have gives many newspapers a competitive advantage over their rivals. But the events of life are open to all who inquire. There is no dearth of those willing to inquire and report those events, for proper compensation. Thus the court must here be holding that if a concern gathers from the air, from the sunlight, or from the waters of the sea, by its effort and ingenuity, something that others have not garnered, it must make the results of its activity open to all, for if it sells to some and not to others the former will have a competitive advantage. The exclusive use of that which is thus obtained always, in a sense, gives a competitive advantage over those less active and enterprising. The opinion seems to mean that no contract, however narrow its effect, however innocent its purpose, which in the least degree restricts competition,[7] can survive attack under the Sherman Act; that no such concept as a reasonable restraint, a restraint limited to the legitimate protection of one's property or business, and limited in space or in time, or affecting a few only of all those engaged in a given trade, is free of illegality. Is not this to reestablish the harsh and sweeping effect attributed to the statute in *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, and *United States* v. *Joint Traffic Association,* 171 U. S. 505, which was abandoned more than thirty years ago, for the view, ever since maintained, that the statute

---

[7] It was only in this limited sense that the court below found that the by-laws limited competition.

merely adopted the common law concept of undue and unreasonable restraints of trade.[8] If the court is now to revert to the harsh and mechanical application of the act that *every* agreement which in any measure restrains trade (notwithstanding the truism that "every agreement concerning trade . . . restrains"[9]) is illegal, the ruling should be made explicit and not left in the realm of speculation.

The opinion says that the District Court found that the by-laws "contained provisions designed to stifle competition in the newspaper publishing field." The District Court made no finding and reached no conclusion that AP imposed any restraint which was undue or unreasonable, and the matter quoted in footnotes 6 and 8 of the court's opinion does not support any such gloss as this court places on what the District Court said in its opinions or its formal findings and conclusions, as a mere reading will demonstrate.

If collateral restraints in agreements for the sale of a business, and others of like sort, permitted and enforced at common law, and heretofore under the Sherman Act[10] as well, are now to fall under condemnation, we should know the fact.

The opinion assumes that the competitors of AP suffer from an inability to buy news. It is replete with intima-

---

[8] *Standard Oil Co.* v. *United States,* 221 U. S. 1, 59–62; *United States* v. *American Tobacco Co.,* 221 U. S. 106, 178–179; *United States* v. *Terminal R. Assn.,* 224 U. S. 383, 394–395; *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238–239; *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563, 582; *Appalachian Coals* v. *United States,* 288 U. S. 344, 359–361, 375, 376–7; *Sugar Institute* v. *United States,* 297 U. S. 553, 597–600; *Interstate Circuit* v. *United States,* 306 U. S. 208, 230–232.

[9] *Chicago Board of Trade* v. *United States, supra,* 238; *Appalachian Coals* v. *United States, supra,* 361.

[10] *Oregon Steam Navigation Co.* v. *Winsor,* 20 Wall. 64; *Cincinnati Packet Co.* v. *Bay,* 200 U. S. 179, 184, 185; *United States* v. *General Electric Co.,* 272 U. S. 476; *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707.

tions that the cooperative activities of AP have, in fact, seriously impeded the founding and growth of other news-gathering agencies than AP and its member news-gathering agencies and other newspapers than AP's member newspapers. They are too many for enumeration, but may be illustrated by the court's statement that "historically, as well as presently, applicants who would offer competition to old members have a hard road to travel," and that "a newspaper without AP service is more than likely to be at a competitive disadvantage."

These conclusions are without support in the record or in the findings of the court below, and are unsupported by any finding by this court based upon the facts of record. This can be demonstrated.

The findings of the District Court, which this court has not modified, criticised, or overruled, established beyond cavil that, despite the fact that AP was early in the field and has grown to great size, many other reporting agencies have been established and grown in the United States, two of which, UP and INS, are now comparable to AP "in size, scope of coverage and efficiency." Additional agencies which furnish substantial news-reporting services in the nation total between twenty and thirty. Statistics concerning them are not included in the record, but it is evident that some, singly, furnish substantial service, and all, taken together, afford a broad coverage in competition with AP, UP and INS, widely used in the newspaper world. Their past growth, and their opportunity for expansion, contradict the assumption that AP has unreasonably, or in substantial measure, restrained free competition. Rather, its success has stimulated others to enter the field and to compete with it.

The District Court found: "AP does not prevent or hinder nonmember newspapers from obtaining access to domestic and foreign happenings and events." Newspaper publishers differ as to the comparative value of AP

and other services; many choose one in preference to the other; some have relinquished one service and acquired the other. Vast newspaper enterprises have grown up which depend on services other than those furnished by AP. These include metropolitan newspapers with circulations running from two hundred thousand to over a million. Some which have not used AP reports have outstripped competitors who were members of AP.

The uncontradicted evidence and the findings of the District Court disclose, amongst others, the following significant facts: In 1942 the total expenditures of AP and its subsidiaries were $12,986,000, those of UP and its affiliates $8,628,000, and those of INS and its affiliates $9,434,000. Thus two competitors, found by the court below to be in every way comparable with AP, together expended over $5,000,000 more in that year than AP. In the same year AP had 1,247 domestic and 5 foreign members, UP had 981 domestic and 391 foreign subscribers to its services, and INS, in 1941, 338 domestic newspaper subscribers and 3 such foreign subscribers. Here again the total subscribers of its two most substantial competitors outnumbered AP's membership in both the domestic and the foreign field. In the matter of supplying features, news pictures, and news to radio stations, UP and INS would each appear to have at least as many users as AP, although the proofs and the findings do not afford an accurate measure of comparison.

Many of the other agencies, as well as UP and INS, make contracts with their subscribers for the exclusive use of their material in the subscriber's area and field. Both UP and INS make what are known as "asset value" contracts with their subscribers, under the terms of which any newspaper in the same area and field must pay to the existing subscriber the asset value of that subscriber's contract in order to obtain the service. Thus all these agencies recognize that the exclusive right to publish the

news furnished their members or subscribers is valuable. Neither as respects AP, nor any of the other agencies, is there a finding or evidence that such provisions work any hindrance or restraint of competition as between agencies or newspapers.

As respects competition between newspapers which are members of AP and others, it is found that newspapers of large circulation in large municipalities, as well as those of medium and small circulation, have thriven and grown without AP service. The court below said: "Upon this motion we must take it as in dispute whether the general opinion in the calling is that the service of UP is better than that of AP, or vice versa." Newspapers have given up AP service for that of its competitors. Many, in varying localities and fields, not only belong to AP but patronize one or more of the other services, including UP and INS. Some of the largest and most powerful newspapers in the nation have grown to be such without AP service; not an instance is cited where a proposed newspaper was unable to start, or has been compelled to suspend, publication for lack of it. The record contradicts the assertion in the court's opinion that the proof demonstrates "the net effect is seriously to limit the opportunity of any new paper to enter these cities." No finding in these terms was made by the District Court. A great bulk of the material tendered by the defendants runs counter to the conclusion; and certainly, in a summary judgment proceeding, to draw such a conclusion from the averments pro and con of the pleadings and affidavits is to ignore what this court has said is permissible in such a proceeding.

The court below has found that, "at the present time, access to the news reports of *one or more* of AP, UP, or INS is essential to the successful conduct of any substantial newspaper serving the general reading public." (Italics supplied.) It is true also that the District Court found, referring to these three agencies, that "of the three news

agencies . . . AP ranks in the forefront in public reputation and esteem," whatever this may mean. If it means that it is thought the best of the three, this would not seem to advance the argument. If it means that AP is the largest of the three in expenditures, this also is true but irrelevant. Whatever the significance of the finding, it certainly is not a finding that AP has restricted or limited competition either between news agencies or newspapers.

In another aspect of the issue of restraint, the opinion ignores important facts. While it correctly states that, in the daily morning field, AP embraces 81% in number and 96% in circulation, it fails to state that UP serves such newspapers representing 40% in number and 64% in circulation. Again, in respect of the daily evening field, whereas AP members represent 59% in number and 77% in circulation, UP accounts for 45% in number and 65% in circulation. It will be seen that there is duplication because many newspapers take more than one of the existing services. Thus, as of 1941, of the 373 domestic morning English-language dailies,—with a total circulation of 15,849,132,—152, with a total circulation of 10,701,498, were subscribers of UP, and 55, with a total circulation of 4,149,929, were subscribers of INS; and, of the 1,480 domestic daily evening English-language newspapers,—with a total circulation of 19,616,674,—664, with a total circulation of 16,781,020, were subscribers of UP, and 206, with a total circulation of 8,608,180, were subscribers of INS.

The record indicates that, in the large, the events reported by the leading agencies are the same; the differences between the reports being in the way they are written. Inability to peruse an AP report, therefore, does not mean that the reader fails to obtain knowledge of what is happening, but of a particular reporter's account of the event.

Finally, the record contains affidavits which must, on the motion for summary judgment, be taken as true, of

twenty-three persons who are in the newspaper business. These are too lengthy to quote. In general the testimony was to this effect: Ten said the UP service was adequate and complete; thirteen said that AP service was not necessary to the success of a newspaper; one said that a newspaper was at no competitive disadvantage through lack of AP service; and five testified their papers, to which AP membership was open, elected to use competing services. As of September 1941 more than 600 domestic newspapers which were subscribers of UP were not members of AP. The fact is that AP does not attempt to restrain its members from taking services from other agencies. It is little wonder that the District Court refrained from finding that AP had unduly or unreasonably restrained competition between news agencies or newspapers.

I conclude, therefore, that there is no justification for a holding that the operations of AP must inevitably result, or that its activities have in fact resulted, in any undue and unreasonable restraint of free competition in any branch of trade or commerce.

*Third.* Have AP and its members intended, or attempted, to monopolize a branch of trade? As I have already pointed out, the events happening in the world are as open to all men as the air or the sunlight. The only agency required to report them is a human being who will inquire. Surely the supply of reporters is not less difficult to monopolize than the events to be reported.

The court below reached conclusions as to monopoly which were required by the record:

"AP does not monopolize or dominate the furnishing of news reports, news pictures, or features to newspapers in the United States.

"AP does not monopolize or dominate access to the original sources of news.

"AP does not monopolize or dominate transmission facilities for the gathering or distribution of news reports, news pictures, or features."

If the opinion of this court means to suggest that while the news can be gathered by anyone, because no one has, or can have, a monopoly of the events of history, AP monopolizes the services of those who report news which its energies and efforts have employed and trained (which is not shown), then, I submit, we have a new concept of monopolization, namely, that where some person, out of materials open to all, creates his own product, by hiring persons to produce it, that person may not determine to whom he will sell and from whom he will withhold the product. Such a concept can only be justified on the public utility theory upon which the court below proceeded, of which I shall say something later.

In spite of the quoted conclusions of the District Court (and no facts are cited in this court's opinion which negative their accuracy), I must take it that the court intends to hold that the pleadings and proofs disclose, without question, an intent or attempt to monopolize.

I have quoted the finding made below that AP does not prevent or hinder nonmember newspapers from obtaining access to domestic or foreign news. The facts and figures I have cited above indicate no intent or attempt to absorb the entire field of news gathering and reporting, to exclude all others from the field, or to take over the entire field, to the end that no newspaper or combination of newspapers can obtain reports of the news. Paragraph 3 of the complaint charges an attempt to monopolize a part of trade and commerce and a combination and conspiracy to monopolize the same. The answer specifically denies the allegation. The amazing growth of competing agencies, and their size, would seem to indicate that any such supposed intent or attempt had been ill served by the operations of AP. At all events, there is no room in a summary judgment proceeding, based on the facts of record, for any such finding.

*Fourth.* Have the defendants created an organization of such proportions as in fact to monopolize any part of trade

or commerce? In answering the inquiry I need do little more than refer to the facts already summarized. The opinion seeks support for a holding of monopolization, by referring to a finding of the District Court, in these words:

"AP is a vast, intricately reticulated organization, the largest of its kind, gathering news from all over the world, the chief single source of news for the American press, universally agreed to be of great consequence."

It may be conceded that the descriptive adjectives are not ill-chosen, but the record would support a like finding with reference to UP and INS, save for the phrases "largest of its kind" and "chief." And, upon a full trial, it may well be that evidence produced would induce significant findings with respect to size and organization of other existing news agencies. Until now it has been unquestioned that size alone does not bring a business organization within the condemnation of the Sherman Act.[11] And any consideration as to size would equally hold true whether the defendant is a single corporation dealing with many persons in trade or commerce or an instrumentality set up by a number of business enterprises to serve them all on a cooperative basis. The argument of the Government seems to assume that UP and INS, independent corporations, in spite of their size, are not monopolies or attempts to monopolize because they deal at arm's length with their patrons whereas there is something sinister about AP because it deals on the same terms with its own members. I cannot perceive how, if AP falls within the denunciation of the statute, UP and INS do not equally, and by the same test. No significant feature of the practices of the one is absent in those of the others.

*Fifth.* The court's opinion, under the guise of enforcing the Sherman Act, in fact renders AP a public utility sub-

[11] *United States* v. *United States Steel Corp.*, 251 U. S. 417, 451; *United States* v. *International Harvester Co.*, 274 U. S. 693, 707.

ject to the duty to serve all on equal terms. This must be so, despite the disavowal of any such ground of decision. The District Court made this public utility theory the sole basis of decision, because it was unable to find support for a conclusion that AP either intended or attempted to, or in fact did, unreasonably restrain trade or monopolize or attempt to monopolize all or any part of any branch of trade within the decisions of this court interpreting and applying the Sherman Act. Realizing the lack of support for any other, the Government urges that the District Court's ground of decision is sound and that this court should adopt it. Judge Swan, in his dissent below, has sufficiently disposed of this point,[12] and I refer to his opinion, in which I concur, without quoting or paraphrasing it.

Suffice it to say that it is a novel application of the Sherman Act to treat it as legislation converting an organization, which neither restrains trade nor monopolizes it, nor holds itself out to serve the public generally, into a public utility because it furnishes a new sort of illumination—literary as contrasted with physical—by pronouncing a fiat that the interest of consumers—the reading public—not that of competing news agencies or newspaper publishers—requires equal service to all newspapers on the part of AP and that a court of equity, in the guise of an injunction, shall write the requisite regulatory statute. This is government-by-injunction with a vengeance.

Moreover it is to make a new statute by court decision. The Sherman Act does not deal with public utilities as such. They may violate the Act, as may persons engaged in private business. But that Act never was intended and has never before been thought to require a private corporation, not holding itself out to serve the public, whose operations neither were intended to nor tended unreasonably to restrain or monopolize trade, to fulfill the duty

---

[12] 52 F. Supp. 375.

incident to a public calling, of serving all applicants on equal terms.

For myself, I prefer to entrust regulatory legislation of commerce to the elected representatives of the people, instead of freezing it in the decrees of courts less responsive to the public will. I still believe that "the courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it." [13]

But more, the courts are unfit instruments to make and implement such policy. A wise judge has said in a case brought by AP to redress the alleged wrong of INS in "pirating" AP's news: [14]

"Courts are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right in news or of the circumstances under which news gathered by a private agency should be deemed affected with a public interest. Courts would be powerless to prescribe the detailed regulations essential to full enjoyment of the rights conferred or to introduce the machinery required for enforcement of such regulations. Considerations such as these should lead us to decline to establish a new rule of law in the effort to redress a newly-disclosed wrong, although the propriety of some remedy appears to be clear."

The considerations which led to the conclusion are persuasively stated in the preceding pages of the cited opinion.

The opinion asserts that, whatever the court below has said, this court does not adopt its reasons for the decree entered, but sustains its action upon the basis of restraint and monopoly violative of a prohibitory law. I think, however, this is too superficial a conclusion. The fact remains, as the court below concedes, that the role essayed "is ordinarily 'legislative.'" [15]

[13] *Nebbia* v. *New York*, 291 U. S. 502, 537.
[14] *International News Service* v. *Associated Press*, 248 U. S. 215, 267.
[15] 52 F. Supp. 370.

From now on, AP is to operate under the tutelage of the court. It is ordered to submit for approval a revision of its by-laws, and, unless the court approves the changes, it is to be restrained from contracting with its members that they shall not disclose the news it furnishes, and from continuing its existing contract relations with a Canadian news agency, both of which are held, in and of themselves and apart from the alleged illegalities of the by-laws, innocent and legal. However the by-laws may be amended, and whatever judicial blessing may be given the new text, it is certain that every refusal to deal with any newspaper will evoke a fresh exercise of the judicial guardianship. Lawful practices may be threatened with injunction, as they are in the present decree, as a lever to compel obedience in some respect thought important by the court.

The decree may well result not in freer competition but in a monopoly in AP or UP, or in some resulting agency, and thus force full and complete regimentation of all news service to the people of the nation. The decree here approved may well be, and I think threatens to be, but a first step in the shackling of the press, which will subvert the constitutional freedom to print or to withhold, to print as and how one's reason or one's interest dictates. When that time comes, the state will be supreme and freedom of the state will have superseded freedom of the individual to print, being responsible before the law for abuse of the high privilege.

It is not protecting a freedom, but confining it, to prescribe where and how and under what conditions one must impart the literary product of his thought and research. This is fettering the press, not striking off its chains.

The existing situation with respect to radio points the moral of what I have said. In that field Congress has imposed regulation because, in contrast to the press, the physical channels of communication are limited, and chaos would result from unrestrained and unregulated use of

such channels. But in imposing regulation, Congress has refrained from any restraint on ownership of news or information or the right to use it. And any regulation of this major source of information, in the light of the constitutional guarantee of free speech, should be closely and jealously examined by the courts.

The court goes far afield in citing *Associated Press* v. *Labor Board*, 301 U. S. 103, and *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.*, 293 U. S. 268, as justifying the decree. Apart from the fact that the policy and the implementing regulation involved in the *Associated Press* case was that declared by Congress, not court-made, it is plain from the opinion that the freedom to publish or to refrain from publishing, the control of its news by AP and the entire conduct of its business, save only its duty to deal with employees as a class, was untouched.[16] In the *Farmer's Guide* case all that was decided was that the newspapers there in question were engaging in interstate commerce and that newspapers, like other business enterprises, can violate the Sherman Act by unreasonably restraining or monopolizing commerce in more than one state. I should be the last to deny the correctness of these propositions. But, as I have already said, when that case came to be retried, it was found that the concert of action in joint solicitation of advertising and granting a reduced rate for it if placed in all the journals in the combination violated none of the provisions of the Act.[17]

The CHIEF JUSTICE joins in this opinion.

MR. JUSTICE MURPHY, dissenting.

I

If it were made clear by the undisputed facts that, by adopting their by-laws, the members of the Associated

---

[16] See 301 U. S. 132–3.

[17] *Supra*, note 3.

Press were engaged in a program to hamper or destroy competition, I could accept the decision reached by the Court. But the evidence introduced, in my opinion, falls far short of proving such a program and hence the decision has grave implications relative to governmental restraints on a free press.

As I view the situation, the members of the Associated Press were entirely within their legal rights in forming a cooperative organization with facilities for the collection and exchange of news and in limiting the membership therein. Members of an incorporated society, as a general rule, may extend the privilege of membership or withhold it on such terms as they see fit. And if exclusive access to these facilities and reports gave the members of the Associated Press a competitive advantage over business rivals who were not members, that alone would not make the advantage unlawful. In restricting the admission of business rivals they were merely trying to preserve for themselves an advantage that had accrued to them from the exercise of business sagacity and foresight. Such an advantage, as I see it, is not a violation of the Sherman Act. Nor does this advantage require the Associated Press to share its products with competitors. Such a doctrine would discourage competitive enterprise and would carry the anti-trust laws to absurd lengths. In the words of the court below, "a combination may be within its rights, although it operates to the prejudice of outsiders whom it excludes." 52 F. Supp. 362, 369.

Thus for the first time the Court today uses the Sherman Act to outlaw a reasonable competitive advantage gained without the benefit of any of the evils that Congress had in mind when it enacted this statute. On the main issue before us, the record shows a complete absence of any monopoly, domination, price fixing, coercion or other predatory practices by which competition is eliminated to the injury of the public interest. *Apex Hosiery Co.* v. *Leader*,

310 U. S. 469, 491–501. And the District Court was unable to find otherwise. Nothing appears save a large, successful organization which has attempted to protect the fruits of its own enterprise from use by competitors. To conclude on such evidence that the Associated Press has violated the Sherman Act is to ignore the repeated holdings of this Court that the purpose of the statute is to maintain free competition in interstate commerce and to eliminate only those restraints that unreasonably inhibit such competition.

## II

Today is also the first time that the Sherman Act has been used as a vehicle for affirmative intervention by the Government in the realm of dissemination of information. As the Government states, this is an attempt to remove "barriers erected by private combination against access to reports of world news." That newspapers and news agencies are engaged in business for profit is beyond dispute. And it is undeniable that the Associated Press and other press associations can claim no immunity from the application of the general laws or of the Sherman Act in particular. *Associated Press* v. *Labor Board*, 301 U. S. 103, 132–133. But at the same time it is clear that they are engaged in collecting and distributing news and information rather than in manufacturing automobiles, aluminum or gasoline. We cannot avoid that fact. Nor can we escape the fact that governmental action directly aimed at the methods or conditions of such collection or distribution is an interference with the press, however differing in degree it may be from governmental restraints on written or spoken utterances themselves.

The tragic history of recent years demonstrates far too well how despotic governments may interfere with the press and other means of communication in their efforts to corrupt public opinion and to destroy individual free-

dom.  Experience teaches us to hesitate before creating a precedent in which might lurk even the slightest justification for such interference by the Government in these matters.  Proof of the justification and need for the use of the Sherman Act to liberate and remove unreasonable impediments from the channels of news distribution should therefore be clear and unmistakable.  Only then can the precedent avoid being a dangerous one authorizing the use of the Sherman Act for unjustified governmental interference with the distribution of information.

This does not mean that the Associated Press is entitled to any preferential treatment under the Sherman Act or that the Government must meet any higher degree of proof of a statutory violation when dealing with the press than when dealing with any other field of commercial endeavor.  Clear and unmistakable proof of a Sherman Act violation, especially where a summary judgment procedure is followed, is necessary in any case.  And failure to insist upon compliance with that standard of proof is unwise under any circumstances.  But such a failure has unusually dangerous implications when it appears with reference to an alleged violation of the Act by those who collect and distribute information.  We should therefore be particularly vigilant in reviewing a case of this nature, a vigilance that apparently is not shared by the Court today.

As applied to the Sherman Act, this means that an allegation by the Government that a monopoly or restraint of trade exists in the business of collecting and distributing information should be proved by clear evidence after a full canvass of all the pertinent facts.  Nothing should be left to speculation, doubt or surmise.  Nor can conjectures as to probabilities or inevitable consequences replace proof of the actual or potential existence of monopolies or restraints.  In other words, before the Government is entitled to enjoin a combination or conspiracy alleged to be

in restraint of news dissemination it must be shown by competent evidence that such combination or conspiracy has in fact resulted in restraints or will inevitably produce actual restraints in the future. Full opportunity should be accorded the parties to cross-examine and rebut all the evidence adduced on both sides of the litigation. Such would be the requirements in any suit under the Sherman Act against those who sell food, steel or furniture, and no cogent reason is apparent for applying less stringent requirements when dealing with the business of the press. Indeed, the very nature of the newspaper business is a compelling reason for a strict adherence to these requirements. Any possible use of the Sherman Act as a ready vehicle for unjustified governmental interference in the dissemination of news is thus avoided by insistence upon these elemental standards of proof and fairness of procedure. The actual and potential dangers in any such interference greatly outweigh any public interest in destroying an abandoned, ineffective or abortive scheme that appears at first glance to restrain competition among newspapers.

Accordingly I am unable to agree that this case should be disposed of in favor of the Government on a motion for summary judgment. The issues are too grave and the possible consequences are too uncertain not to require the Government to prove its case by more probative and convincing evidence than it has submitted so far. The admitted facts are either inconclusive or definitely lean in favor of the contentions of the Associated Press. These admitted facts, in my estimation, do not constitute such clear evidence of an alleged restraint of trade as to justify the proposed interference by the Government in the Associated Press membership rules which underlie the distribution of Associated Press dispatches. They do not justify the conclusion that the Associated Press by-laws on their face, and without regard to their past effect, will "necessarily" result in unlawful restraints. It may well be that

these by-laws will restrain trade and ought to be enjoined but I am unwilling to reach that conclusion without requiring the parties and the court below to examine the facts more thoroughly, having in mind the dangerous implications inherent in this situation and the clarity of proof that the Government should present.

## III

The nub of the complaint against the Associated Press is that its by-laws (1) allow discrimination in the condition of admission based upon the factor of an applicant's competition with a present member, and (2) enforce such discriminatory exclusion through a non-trading agreement among members, an agreement which the court below found to be reasonable when considered separately. In other words, these by-law provisions are said to constitute a combination for the purpose of excluding competitors from that part of the market within the scope of the agreement and hence be an unreasonable restraint of trade within the well-settled meaning of the Sherman Act.

It may be conceded that these by-law provisions on their face are restrictive in nature and that their natural effect is to exclude outside newspapers from the benefits of Associated Press membership. But that concession does not prove that these provisions are necessarily so unreasonable in nature as to be a restraint of the type clearly condemned by the Act. They may be regarded on this record as nothing more than the exercise of a trader's right arbitrarily to choose his own associates and to protect the fruits of his own enterprise from use by competitors. *United States* v. *Colgate & Co.,* 250 U. S. 300, 307; *International News Service* v. *Associated Press,* 248 U. S. 215, 235. Any frustration of competition that might result from such an exercise is a normal incident of trade in a competitive economy, a lawful objective of business enterprise. Certainly the Sherman Act was not designed to discourage men from

combining their talents and resources in order to outdo their rivals by producing better goods and services. It was meant to foster rather than to thwart or punish successful competition. Competitive practices emerge as unreasonable restraints of trade only if they are infused with an additional element of unfairness, such as monopoly, domination, coercion, price fixing or an unreasonable stifling of competition. If there is such a factor in this instance, however, it lies deep in the unfathomed sea of conflicting or unproved facts.

If it were true that the Associated Press monopolizes or dominates the newspaper field, these by-law provisions might be found to be unreasonable restraints of trade. Then the unfairness of excluding outside newspapers because of their competition would be manifest. See *United States* v. *Terminal Railroad Assn.*, 224 U. S. 383. But the Government makes no such claim. In fact, the District Court specifically found no evidence of monopoly or domination by the Associated Press in the collection or distribution of news, the means of transmitting the news, or the access to the original sources of the news. A brisk rivalry with the United Press and the International News Service is recognized in these matters. Associated Press thus has no power, through the use of its by-laws or because of its size, to exclude non-members from receiving or obtaining news reports. In this respect there is no basis for concluding that the by-laws will "necessarily" restrain trade.

A point is made of the fact, however, that the Associated Press is the largest of the news agencies, ranking "in the forefront in public reputation and esteem" and constituting "the chief single source of news for the American press, universally agreed to be of great consequence." A unique value is said to attach to Associated Press news reports, growing out of the fact that they are furnished by an agency composed of and controlled by newspapers representing nearly every shade of opinion and geographical

section of the nation. These characteristics are claimed to furnish an invaluable guaranty that the news will be presented by Associated Press with a minimum of political and sectional bias. The great size and extent of the Associated Press facilities are also said to lend a uniqueness to its reports.

But there is no evidence in the present state of the record that these factors, if they exist, make the Associated Press reports so superior to those of its rival agencies as to clothe Associated Press reports in the robes of indispensability or that competition by non-members is hindered or restrained unnecessarily. Perhaps the Government has evidence to that effect which should be introduced. In the absence of such evidence, however, neither the policy nor the language of the Sherman Act penalizes those who, by their enterprise and sagacity, have formed a news service of the first rank and of unique value in the eyes of a considerable portion of the public. A cooperative organization, untinged with any monopolistic or other objectionable hue, is free to exceed its competitors in size and excellence without losing its right to choose its members and to protect its own unique products from the use of others.

If it were shown that the Associated Press, through its by-laws, has stifled or is inevitably bound to stifle competition by non-member newspapers in an unreasonable manner, so as to injure the public interest, a violation of the Sherman Act would be beyond dispute. This appears to be the primary basis for the result reached by the Court today, for it states that inability to buy news from the Associated Press "can have" most serious effects on competing newspapers and that they are "more than likely" to be at a competitive disadvantage. But even if competitive disadvantage, under some circumstances, is sufficient to prove an unreasonable stifling of competition, the Government has as yet produced no evidence to support the existence or the likelihood of such a disadvantage.

On the contrary, the evidence submitted by the Associated Press and accepted as true by the District Court demonstrates that many newspapers have flourished without Associated Press service and have successfully competed with Associated Press members. These proofs also indicate that numerous papers actually prefer the services of other news agencies to that of Associated Press; several of them having actually dropped their Associated Press membership and become members of one of the other news associations. Moreover, there is a complete lack of any relevant proof justifying the conclusion that the Associated Press membership policy has prevented or hindered the birth of a competing newspaper, prevented or hindered the successful operation of one, or caused one to be discontinued.

Nor does it appear from the record that any appreciable segment of the public has been unduly deprived of access to world news through inability to read Associated Press dispatches in non-member newspapers. Indeed, the very presence of Associated Press newspapers in cities where there are competing non-members would seem to assure the public of Associated Press news at a small cost. The wide-spread service of the Associated Press, covering both towns with and without competing services, is to that extent a guarantee of adequate access to its dispatches.

It is conceivable, of course, that these by-laws "can have" adverse effects upon competition and upon the public. But something more than a bare possibility should be required before we are justified in sanctioning interference by the Government with the private dissemination of information. There should be clear proof here not only of a competitive advantage but also of some unfair use of any competitive advantage that the Associated Press may possess or proof that it is acting so as to stifle competition unreasonably. Evidence of this nature, moreover, unless it is undisputed, should be thoroughly tested in the cruci-

ble of cross-examination and counter-evidence. An issue of this nature deserves more than a summary disposition.

Thus if it were shown that the Associated Press was using its by-laws to fix prices for news reports or to coerce non-member newspapers in some way, a clear violation of the Sherman Act would be proved. Under certain circumstances these by-laws conceivably might be employed for the purpose of coercing the non-members to join the Associated Press, to refrain from obtaining news from other sources or to cease operations. But no attempt has been made by the Government to allege or prove such facts and their existence cannot be assumed any more than we can presuppose unfair destruction of competition in order to justify the decree of the court below.

At the same time, however, most of the cases cited in support of the result reached by the Court today are relevant only to a situation where there is some element of coercion or unfairness present. Thus the combination in *Montague & Co.* v. *Lowry,* 193 U. S. 38, was designed to force non-members to join as the price of being able "to transact their business as they had theretofore done." In *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, a combination was formed to prohibit sales to non-member jobbers, thereby tending to force them to join. In *Eastern States Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, retailers combined and refused to buy from wholesalers who sold directly to consumers, as a result of which the wholesalers were compelled to cease selling at retail. The combination in *Fashion Originators' Guild* v. *Federal Trade Commission,* 312 U. S. 457, organized a boycott against those who refused to comply with its program, thus narrowing the market and forcing them to cease pirating designs. Finally, the combination in *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, used its buying power to eliminate competition with exhibitors and to acquire a monopoly in the areas in question.

There is thus no direct or authoritative precedent guiding our decision in this case. None of the foregoing cases or any other that could be cited justifies us in sanctioning the application of the Sherman Act on an unproved assumption that a particular combination will "necessarily" and illegally restrain competition in the face of overwhelming evidence to the contrary. Nor are any of these cases authority for deciding a Sherman Act case on a motion for summary judgment where serious doubts exist as to the alleged unreasonableness of the restraint of trade. No case, moreover, bids us to sanction an application of the Sherman Act to the business of gathering and distributing news with our eyes closed to the inevitable implications and hazards.

We stand at the threshold of a previously unopened door. We should pause long before opening it, lest the path be made clear for dangerous governmental interference in the future. A decree of the type present in this case is not of necessity an undue interference by the Government. If it were supported by facts, it would be a reasonable and justifiable method of liberating non-member newspapers from the alleged coercive yoke of the Associated Press and of assuring the public of full access to the news of the world. But the danger lies in approving such a decree without insisting upon more proof than yet produced by the Government. If unsupported assumptions and conjectures as to the public interest and competition among newspapers are to warrant a relatively mild decree such as this one, they will also sustain unjust and more drastic measures. The blueprint will then have been drawn for the use of the despot of tomorrow.

Since I am of the opinion that the judgment should be reversed and the cause remanded to the District Court for further consideration in light of the principles I have mentioned, I do not deem it necessary to comment in detail on the other parts of the decree discussed by the Court.

At the same time, however, it seems only fair to state that on the facts presented it is difficult to see any justification for the agreement whereby Associated Press is given the exclusive right to Canadian Press news reports in the United States. Associated Press is thereby given an outright monopoly of the only available comprehensive news coverage of a great nation, no comparable substitute being available. The only other matter remaining in doubt is the by-law restriction which prevents the Associated Press members from making their spontaneous local news available to non-members and to rival news agencies. The lower court appears to have thought this provision reasonable when considered apart from the membership restriction. On the present state of the record I am not prepared to disagree although I am inclined to believe that this provision may well be shown to be unreasonable.