Jones, Chief Judge,
delivered the opinion of the court:
The single issue in this case is whether plaintiff was entitled to deduct for income and excess profits tax purposes losses[1] which it alleges were the direct result of the decision *456 of the Supreme Court in the case of Associated Press v. United States, 326 U. S. 1 (1945).
In that case the Supreme Court held that the action of the Associated Press (hereinafter referred to as AP) in endeavoring to grant the exclusive right to any one of its members to the AP services in its community was illegal in that it was a restraint of trade in interstate commerce and, therefore, violated the terms of the Sherman Anti-Trust Act, 15 U. S. C. §§ 1-7.
In 1918, plaintiff purchased the assets of an evening and Sunday newspaper published in Pueblo, Colorado, known as “The Pueblo Star-Journal.” Included in the assets thus purchased was a membership certificate in the AP for an evening and Sunday newspaper. This carried with it the right to publication of news received from the AP between the hours of 9 a. m. and 7 p. m.
In 1933, the plaintiff purchased the physical assets of “The Chieftain Printing Company” which at the time published a morning, Sunday and weekly newspaper in Pueblo. Among the assets acquired in this purchase was included a membership certificate in the AP for a morning and Sunday newspaper, which gave the exclusive AP privilege between the hours of 7 p. m. and 9 a. m.
In order to simplify the issue, the respective litigants have stipulated that the AP membership acquired from the Star-Journal company in 1918 had a cost basis for income tax purposes of $39,000, and that the membership acquired in 1933 from The Chieftain Printing Company had a cost basis of $43,500 for tax purposes.
These franchises included two features, the first being the exclusive right to use the AP news free of competition from other newspapers in the designated area, and the second being the right of the plaintiff to receive AP news on a *457 current basis for which the plaintiff and other AP members were and are currently assessed on a weekly pro rata basis. Since 1938 the plaintiff has continuously paid the AP weekly assessments for news for both morning and evening services.
In 1945, in compliance with the aforementioned Supreme Court decision, the AP changed its bylaws so that they no longer contained the exclusive privilege feature, and after that date provision was made in the bylaws of the AP so that competing newspapers in the same area could have the benefit of the AP news service if they paid the current assessments and otherwise met the requirements of membership.
The plaintiff continued to publish its newspapers after the decision of the Supreme Court as it had done previously. It retained its membership in the AP and has used its facilities in the publications. It has not disposed of its two memberships for AP service. It has not sold its publishing company. It does claim, however, that the Supreme Court decision in striking down the monopoly in AP news coverage which it theretofore enjoyed caused it to lose the cost of such memberships.
In 1946 and 1947, following the publication of the amendments of the bylaws of the AP, the plaintiff charged off against surplus the amount of its investments in AP franchises.
The plaintiff contends that the decision of the Supreme Court completely destroyed the sales value of the memberships, and that after that decision and the resultant change in the AP bylaws no one would buy a membership from the previous exclusive franchise holders as one could be secured from the AP itself if the other requirements were met and the dues paid. Therefore, plaintiff asserts that the price which it paid for these exclusive memberships has become a complete loss and that as a result it is entitled to an adjustment and refund of income and excess profits taxes for the years 1943 and 1945 in an amount that would result from permitting a deduction of the original franchise costs as ordinary business losses.
The defendant contends that from 1933 to date plaintiff has published the only daily and Sunday newspaper published in Pueblo, Colorado, and is still publishing the only *458 daily and Sunday newspaper published in Pueblo, Colorado; that the plaintiff has not in any way disposed of its franchises ; that it still uses them in Pueblo, Colorado, and therefore plaintiff has sustained no deductible loss.
The plaintiff admits that the Tax Court of the United States in three cases has refused to allow other newspapers a business loss deduction under section 23 (f) of the Internal Revenue Code of 1939 by reason of the loss of the exclusiveness of their AP membership certificates and that these cases are as follows: Reporter Publishing Co. v. Commissioner, 18 T. C. 86; aff., 201 F. 2d 743, (C. C. A. 10th 1953); Independent Publishing Co. v. Commissioner, 1955 T. C. Memo. 274; aff., 238 F. 2d 238 (C. C. A. 4th 1956) ; The New York Sun v. Commissioner, 27 T. C. 319. It undertakes to distinguish the facts in these three cases from the case at bar. However, both the facts and the issues were so nearly the same that it is difficult to find any substantial difference. We quote from the opinion in the Reporter Publishing Company v. Commissioner, supra, at pages 90 and 91:
* * * It is clear, of course, from decisions which we will presently cite that this mere diminution in value would not be the occasion for allowing petitioner any deductible loss. We could only allow petitioner a loss of its cost basis of its A. P. franchise by holding that in the taxable year the franchise became entirely worthless. But petitioner’s continued use of A. P. and its many other benefits negates any claim of its worthlessness. There has been no sale or any disposition of its A. P. membership. It still owns it and uses it in its newspaper business.
We find that petitioner has an unrealized partial loss which results from reduction in sales value.
Fluctuations in values of assets are ever present in our complex economic structure. That diminution in value as such is not deductible as a loss is almost axiomatic to the income tax law. J. C. Pugh, Sr., 17 B. T. A. 429, 434, affd., 49 F. 2d 76, certiorari denied, 284 U. S. 642; White Star Line, 20 B. T. A. 111; Ewald Iron Co., 37 B. T. A. 798; and Gulf Power Co., 10 T. C. 852, 858.
In the case of Independent Publishing Co. v. Commissioner, supra, in which the Tax Court decision, adverse to plaintiff in a similar case, was upheld by the Court of *459 Appeals for the Fourth Circuit in a per curiam opinion, we find at page 239 of the Circuit Court opinion the following language:
We think that the decision of the Tax Court was correct and should be affirmed. It was shown therein that the loss was not realized within the meaning of the tax statute and regulations, in that the asset was retained and used by the taxpayer in carrying on its business. See also the prior decision of the Tax Court in Reporter Pub. Co. v. Commissioner, 18 T. C. 86, affirmed by the Tenth Circuit, 201 F. 2d 743.
There is no merit in the taxpayer’s contention that the earlier decision was erroneous because it failed to take into account the fact that the bylaws of the Associated Press which constituted the membership contract between the Associated Press and its members, were amended after the decision of the Supreme Court in order to comply therewith. We agree with the conclusion of the Tax Court in the pending case that this circumstance amounted only to an elimination of the non-competitor provision of the original contract and that no loss was realized within the meaning of the tax statutes because the membership was not discarded but was continued for use in the taxpayer’s business.
To the same effect in a very similar case involving the same issue was the decision in the New York Sun v. Commissioner, supra.
In the light of these decisions in which it has been uniformly held in very similar fact situations that plaintiffs were not entitled to the deduction, we are unable to conclude that plaintiff has sustained such a loss as is deductible under the Internal Revenue Code.
The question also arises as to whether one should be prohibited from deducting as a loss money spent in securing an illegal privilege. However, for the reasons hereinbefore set forth, we find it unnecessary to pass upon this issue.
Plaintiff is not entitled to recover. Its petition is dismissed.
It is so ordered.
Laramore, Judge; Madden-, Judge; Whitaker, Judges and Littleton, Judge, concur.
*460 FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes the following findings of fact:
1. The plaintiff is a corporation organized in 1918 under the laws of Colorado, having its principal office in Pueblo, Colorado. It is, and since 1918 has been, engaged in publishing newspapers. Upon its organization it succeeded The Star-Journal Publishing Company which had published a newspaper in that city continuously from sometime prior to 1904.
2. By this action the plaintiff seeks to recover income and excess profits taxes paid by it which it says were wrongfully withheld due to the refusal by the Commissioner of Internal Eevenue to allow as an ordinary business loss plaintiff’s cost of Associated Press franchises which it says further were rendered worthless as a result of the decision of the Supreme Court in 1945 in an antitrust case.
3. The plaintiff at the present time publishes a daily morning newspaper known as “The Pueblo Chieftain” and a daily evening newspaper known as “The Pueblo Star-Journal,” both in Pueblo, Colorado. It also publishes a joint Sunday newspaper in Pueblo, Colorado.
4. On March 1, 1918, the plaintiff acquired all the assets of The Star-Journal Publishing Company including the Associated Press membership certificate No. 1234, issued to John F. Vail for publication of an evening and Sunday newspaper with Associated Press news.
5. The parties have stipulated that the Associated Press membership referred to above had a cost basis for Federal income tax purposes at the time of acquisition by plaintiff of $39,000. The manner in which this figure has been computed is not shown in the record. It is clear that it was not paid to Associated Press.
6. After March 1,1918, and continuing to January 21,1933, The Star-Journal Publishing Company published an evening and Sunday newspaper in Pueblo, Colorado.
7. The Star-Journal, prior to 1933, owned the Associated Press franchise for evening and Sunday publication, and *461 The Chieftain, another newspaper published in Pueblo, Colorado, owned the Associated Press franchise for morning and Sunday publication. The evening Associated Press rights gave The Star-J ournal the right to publish between 9 a. m. and 7 p. m. news received from the Associated Press. The morning rights gave The Chieftain the right to publish from 7 p. m. to 9 a. m. news received from Associated Press.
8. For many years prior to 1933, The Chieftain Printing Company, a corporation organized and existing under and by virtue of the laws of the State of Colorado, published in Pueblo, Colorado, a morning and Sunday newspaper. The said Chieftain Printing Company at that time also published a weekly newspaper known as “The Colorado Chieftain.”
9. On January 21,1933, the plaintiff, in order to eliminate competition, acquired substantially all of the physical assets of The Chieftain Printing Company, except real estate, as well as its Associated Press franchise.
10. The parties have stipulated that the Associated Press franchise acquired from The Chieftain Printing Company on January 21,1933, had a cost basis for Federal income tax purposes to the plaintiff of $43,500. The record does not show the manner in which such figure was computed.
11. After the agreement dated January 21, 1933, was entered into, “The Pueblo Chieftain” was published by the plaintiff in Pueblo, Colorado, as a morning paper, and “The Pueblo Star-Journal” was published by the plaintiff in Pueblo, Colorado, as an evening paper. After January 21, 1933, the plaintiff published a Sunday paper known as “The Pueblo Star-Journal and Sunday Chieftain.” The plaintiff also publishes a paper known as “The Colorado Chieftain.” Since January 16,1933, the plaintiff has been the only publisher of daily newspapers in Pueblo, Colorado.
12. The Associated Press is a nonprofit cooperative association incorporated under the Membership Corporation Law of the State of New York. Its purpose and business always has been and is the collection, assembly, and distribution of news to members. The news which it distributes is obtained originally by its own employees, employees of its member newspapers, and employees of foreign independent news services with which it has contractual relations. The *462 news lias always been distributed to the various newspaper members of the Associated Press through interstate channels of communication. Members pay for the service under an assessment plan which contemplates no profit to the association.
13. The Associated Press franchises which the plaintiff acquired in 1918 and 193S had two features. The first feature was the exclusive right to use the Associated Press news free of competition from other newspapers in the plaintiff’s designated area. The second feature was the right of the plaintiff to receive Associated Press news on a current basis for which the plaintiff and all other Associated Press members were and are assessed on a weekly pro rata basis. The plaintiff, since 1933, has paid the Associated Press weekly assessments for the use of Associated Press news for both the morning and evening news service.
14. Prior to 1945, the bylaws of the Associated Press prohibited all members from selling news to nonmembers. Prior to 1945, membership in the Associated Press, with its aforesaid exclusive privileges, had been held by the Board of Tax Appeals (now the Tax Court of the United States) to be a business asset of ascertainable value. In the sale of newspaper publishing companies, the Associated Press franchise influenced directly the purchase price. The Associated Press franchises could not be sold or transferred except through the sale or transfer of ownership of the newspaper which had the Associated Press membership. Provision was made in the bylaws of the Associated Press for admission to membership of noncompeting applicants. However, until 1942, each member of the Associated Press had what was known as the “right to protest” against the application of any potential competitor. In order to override the protest of a member, a vote of four-fifths of the membership of the Associated Press was required. The membership and franchise rights which the plaintiff acquired, as set forth above, in 1918 and 1933 were likewise subject to these rights of protest until 1942.
15. In 1942, the bylaws of the Associated Press were amended and the above right to protest was eliminated. After 1942, the bylaws left the board of directors free to elect *463 new members unless the applicant would compete with old members, in which event the board could not act at all in the absence of consent by the applicant’s member competitor. Should the old member object to admission of his competitor, the application had to be referred to a regular or a special meeting of the association. As a prerequisite to election, the applicant was required to (a) pay to the association 10 percent of the total amount of the regular assessments received by it from old members in the same competitive field during the entire period from October 1,1900, to the first day of the month preceding the date of the election of the applicant, (b) relinquish any exclusive rights the applicant may have had to any news or news picture services, and when requested to do so by his member competitor in that field, had to require that such news or news picture services, or any of them, be furnished to such member or members upon the same terms as they were made available to the applicant, and (c) receive a majority vote of the regular members of the association who voted in person or by proxy.
16. By decision dated June 1, 1945, the Supreme Court of the United States, in the case of Associated, Press v. United States, 326 U. S. 1, 89 L. Ed. 2013, held that under the then existing bylaws of the Associated Press, the association and its members were in violation of the Federal Antitrust Act.
17. Prior to November 28, 1945, the Associated Press bylaws protected members against competition in the use of Associated Press news in a member’s coverage area. As a practical matter, after November 28,1945, any publisher who could afford to pay for the service (irrespective of competition with other Associated Press members) could become an Associated Press member and receive the Associated Press news service. Thus after November 28, 1945, Associated Press news service was open to all.
18. By reason of the Supreme Court decision referred to -above, the plaintiff’s Associated Press franchises lost their exclusive nature. Since said Supreme Court decision and •since the amendment of the bylaws of the Associated Press on November 28, 1945, it is possible for any publisher who is financially responsible to become an Associated Press member .-and thereby acquire the right to publish in any territory news *464 gathered by the Associated Press, whether an Associated Press member is in the territory or not.
19. After November 28, 1945, Associated Press members had no costs, dues, or initiation fees. The officers and directors of the Associated Press, who are generally publishers, receive no compensation for their services. All weekly assessments against Associated Press members are computed on a formula based upon population of the area served by the-Associated Press member. The Associated Press has no accumulated surplus and, in the event of dissolution, in all probability Associated Press members would have to pay their proportionate cost of any liquidation.
20. The plaintiff has published newspapers in the same manner after the decision of the Supreme Court of the-United States, referred to above, as it had done previously. It has retained membership in the Associated Press and has-used its facilities in its publications. It has not disposed of its Associated Press membership. It has not sold its publishing company. In essence, its claim is that the Supreme Court decision, in striking down the monopoly in news coverage which it enjoyed through Associated Press memberships, caused it to lose its cost of such memberships.
21. The plaintiff made no book entries or adjustments to reflect any loss to it during the year 1945 arising by reason of the Supreme Court’s decision. In 1946 or 1947, following the publication of amendments of the bylaws of the Associated Press to conform to the opinion of the Supreme Court,, the plaintiff charged off against surplus the amount of its-investments in Associated Press franchises.
22. On the 15th day of March 1944, and the 14th day of' June 1944, the plaintiff paid to the Collector of Internal Revenue, Denver, Colorado, two equal payments of $14,240.38 each, which constituted a total payment in the amount of $28,480.76 for excess profits taxes for the calendar year 1943.. The Commissioner subsequently, on October 12,1948, allowed the plaintiff an overassessment of excess profits taxes for the-year 1943 in the amount of $367.11, which said overassessment was credited to the plaintiff’s excess profits taxes for the calendar year 1945 and interest thereon.
23. On the 14th day of March 1946, and the 12th day of September 1946, plaintiff paid to the Collector of Internal. *465 Revenue, Denver, Colorado, payments of $15,294.07 and $15,294.10, respectively, which constituted a total payment in the amount of $30,588.17, for excess profits taxes for the calendar year 1945. The Commissioner subsequently, on October 12, 1948, credited overassessments, including those referred to in findings 22 and 24 hereof, in the total amount of $1,201.36 to plaintiff’s excess profits taxes for the calendar year 1945 and interest thereon. On October 29, 1948, the plaintiff paid to the said Collector of Internal Revenue the further amount of $308.36 for excess profits taxes for the calendar year 1945 and interest thereon.
24. On the 14th day of March 1946, and on .the 12th day of September 1946, the plaintiff paid to the Collector of Internal Revenue, Denver, Colorado, payments of $10,586.01 and $10,586.00, respectively, which constituted a total payment in the amount of $21,172.01, for income taxes for the calendar year 1945. The Commissioner subsequently, on October 12, 1948, allowed the plaintiff an overassessment of income taxes for the calendar year 1945 in the amount of $634.71, which said overassessment was credited to the plaintiff’s excess profits taxes for the calendar year 1945 and interest thereon.
25. On December 15,1948, the plaintiff filed with the Collector of Internal Revenue, Denver, Colorado, a claim for refund of income and excess profits taxes paid for the calendar year 1945 in the amount of $50,514.41.
26. On the first day of March 1949, the plaintiff entered into an agreement with the Commissioner of Internal Revenue, Treasury Department, on Form 872, under the terms of which the Commissioner of Internal Reveriue was given until June 30,1950, within which to make additional assessment of income and excess profits taxes for the calendar year 1945 against the plaintiff.
27. Under date of December 22, 1950, the plaintiff filed with the Collector of Internal Revenue, Denver, Colorado, a claim for refund of income taxes collected for the calendar year 1945 in the amount of $19,050.87, which said claim was supplemental and amendatory to the said claim previously filed on December 15,1948.
28. On December 22,1950, the plaintiff filed with the Collector of Internal Revenue, at Denver, Colorado, a claim for *466 refund of excess profits taxes collected for the calendar year 1945 in the amount of $31,944.84, which said claim was supplemental and amendatory to the said claim previously filed on December 15,1948.
29. On December 22,1950, the plaintiff filed with the Collector of Internal Eevenue, Denver, Colorado, a claim for refund of excess profits taxes for the year 1943 based upon an unused excess profits credit carryback from the year 1945 which would result if the 1945 claims were favorably acted upon by the Commissioner of Internal Eevenue.
30. On April 21,1952, the Commissioner of Internal Eev-enue forwarded to the plaintiff a letter dated April 21,1952, which formally notified the plaintiff that all of its aforesaid several claims for refund for the years 1943 and 1945 had been disallowed in full.
31. In the aforesaid claims for refund the plaintiff contended that by reason of the decision of the Supreme Court of the United States, as aforesaid, the Associated Press franchises which the plaintiff had purchased lost their sales value and their loss was deductible in full as an ordinary loss during the year when the loss occurred under section 23 of the Internal Eevenue Code.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 The applicable section of the Internal Revenue Code of 1939, as well as the applicable sections of the Commissioner’s regulations follow:
“Sec. 23. Deductions from gross income.
“In computing net income there shall be allowed as deductions:
* *= * # *
“(f) Losses by corporations. — In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.”
Section 29.23 (f)-l of Regulations 111, provides in part as follows:
“Losses 6y corporations. — Losses sustained by domestic corporations during the taxable year and not compensated for by insurance or otherwise are deductible in so far as not prohibited or. limited by sections 23 (g), 23 (h), 24 (b), 112, 117, 118, and 251. The provisions of sections 29.23 (e)-l to 29.23 (e)-5, inclusive, and section 29.23 (i)-l are in general applicable to corporations as well as individuals. * * *”
Section 29.23 (e)-l of Regulations 111 provides in part as follows:
' “Losses by individuals. — * * *
“In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. Full consideration must be given to any salvage value and to any insurance or other compensation received in determining the amount of losses actually sustained. * * *”
Section 29.23 (e) — 3 of Regulations 111, provides in part as follows:
“Loss of useful value. — When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in section 113 (b) and sections 29.113 (a) (14)-1 and 29.113 (b) (1)-1 to 29.113 (b) (3)-2, inclusive) and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where *456 the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories. The exception applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. Any loss to be deductible under this exception must be fully explained in the return of Income. The limitations provided in section 117 with respect to the sale or exchange of capital assets have no application to losses due to the discarding of capital assets.”